## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **T.D. WILLIAMSON, INC.,**<br><br>   **Plaintiff,**<br><br>v.<br><br>**LINCOLN ELECTRIC AUTOMATION, INC. d/b/a WOLF ROBOTICS,**<br><br>   **Defendant.** | **Court No. 4:21-cv-00153-JCG-SH** |

### <u>OPINION AND ORDER</u>

Before the Court are cross-motions for summary judgment filed by Defendant Lincoln Electric Automation, Inc. d/b/a Wolf Robotics ("Defendant" or "Wolf Robotics") and T.D. Williamson, Inc. ("Plaintiff" or "TDW"). [Def.'s] Mot. Summary J. ("Def.'s Mot. Summary J.") [Doc. 105]; [Def.'s] Mem. Supp. Mot. Summary J. ("Def.'s Moving Br.") [Doc. 106]; Pl.'s Mot. Summary J. ("Pl.'s Mot. Summary J." or "Pl.'s Moving Br.") [Doc. 111].

Also before the Court are motions to file under seal and motions to exclude expert testimony. [Def.'s] Mot. Leave File Mot. Exhs. Mot. Exclude Under Seal ("Defendant's Motion to File Under Seal") [Doc. 109]; [Def.'s] Mot. Limine Exclude Testimony Opinions Dr. Craig Forest ("Defendant's Motion to Exclude Testimony") [Doc. 112]; [Def.'s] Mot. Limine Exclude Testimony Opinions Dr.

Court No. 4:21-cv-00153-JCG-SH                                          Page 2

Craig Forest [Doc. 113]; [Pl.'s] Mot. Exclude Testimony Def.'s Expert Michael

Davis ("Plaintiff's Motion to Exclude Testimony") [Doc. 110]; [Pl.'s] Mot. Leave

File Mots. Exhs. Mot. Summary J. Mot. Exclude Under Seal ("Plaintiff's Motion

to File Under Seal") [Doc. 114].

For the following reasons, the Court grants summary judgment in favor of

Plaintiff for Plaintiff's claim of breach of contract (Count I).  The Court dismisses

Defendant's claim of breach of contract (Counterclaim I), Plaintiff's claim for

constructive fraud/deceit (Count II), Plaintiff's claim for violation of the Oklahoma

Consumer Protection Act (Count III), and Plaintiff's claim for unjust enrichment

(Count IV).

The Court grants Defendant's Motion to File Under Seal and Plaintiff's

Motion to File Under Seal.

The Court denies as moot Defendant's Motion to Exclude Testimony and

Plaintiff's Motion to Exclude Testimony.

## BACKGROUND

This matter was first brought by TDW against Wolf Robotics in Oklahoma

state court on March 8, 2021, and removed to the District Court for the District of

Oklahoma on April 6, 2021.  See Notice of Removal [Doc. 2].

TDW filed its First Amended Complaint on February 15, 2022, alleging

breach of contract (Count I); constructive fraud/deceit (Count II); violation of the

Oklahoma Consumer Protection Act ("OCPA") (Count III); and unjust enrichment

(Count IV).  Am. Compl. ¶¶ 22–51 [Doc. 27].

On March 15, 2022, Wolf Robotics moved to dismiss Counts II to IV of

Plaintiff's Amended Complaint.  Def.'s Part. Mot. Dismiss Pl.'s First Am. Compl.

[Doc. 32].  On September 16, 2022, Judge Frizzell granted in part and denied in

part Defendant's partial motion to dismiss, concluding that Plaintiff sufficiently

pled claims asserted in Counts II to IV, but dismissed Count II "to the extent it is

based on post-contractual representations and/or omissions identical to those

underlying the contract claim."  Order (Sept. 16, 2022) at 6 [Doc. 39].

On September 30, 2022, Wolf Robotics filed its Answer and Counterclaim,

raising 32 affirmative defenses and the counterclaim of breach of contract

(Counterclaim I).  Def.'s Answer [Pl.'s] Am. Compl. Counterclaims ("Def.'s

Answer & Counterclaims") [Docs. 40, 41].

TDW filed its Answer on October 25, 2022, raising seven affirmative

defenses for: (1) failure to state a claim upon which relief may be granted; (2) lack

of damages suffered; (3) damages, if any, caused in whole or in part by Wolf

Robotics' own actions, breach of contract, wrongdoing, or the negligence or

wrongdoing of third parties from whom TDW is not responsible and in no way

were caused by or were otherwise attributable to TDW; (4) failure to mitigate

damages; (5) barring of claims, in whole or in part, by the doctrines of estoppel,

laches, waiver, and/or unclean hands; (6) TDW's entitlement to set-off for any

amounts that may be determined to be owed to Wolf Robotics; and (7) assertion of

any and all defenses, which become available or appear during discovery

proceedings in this action, with the right to amend its answer for the purpose of

asserting such additional affirmative damages. Pl.'s Answer Def.'s Counterclaims

[Doc. 46].

     This matter was re-assigned on July 25, 2024 to the undersigned Judge

sitting by designation in the Northern District of Oklahoma. Order [Doc. 97].

     On January 17, 2025, Wolf Robotics filed its motion for summary judgment.

Def.'s Mot. Summary J.; Def.'s Statement of Undisputed Material Facts ("Def.'s

SUMF") [Doc. 105]. TDW filed its opposition brief, along with a supplement to

its opposition brief.[1] Pl.'s Resp. Def.'s Mot. Summary J. & Mem. Supp. ("Pl.'s

Opp'n Br.") [Doc. 118]; Pl.'s Statement of Disputed Material Facts ("Pl.'s

SDMF") [Doc. 118]; Suppl. [Pl.'s] Resp. Def.'s Mot. Summary J. Mem. Supp.,

[Doc. 124]. TDW also provided "Additional Material Facts Precluding Summary

Judgment" along with its Statement of Disputed Material Facts. Pl.'s Opp'n Br. at

---

[1] On March 13, 2025, TDW filed a Notice of Correction of the Record, striking
footnotes pertaining to two declarations in its opposition briefs based on mistaken
representation. Notice Correction R. [Doc. 130]. TDW filed its supplement to
accompany its Response and Objection to Defendant's Motion for Summary
Judgment with an unexecuted version of Exhibit 12 (Affidavit of Jeff Wilson).
The supplement was filed to update the record with an executed version of this
document.

10–14.  Wolf Robotics filed its reply brief and did not respond to TDW's

"Additional Material Facts Precluding Summary Judgment."  [Def.'s] Reply Supp.

Mot. Summary J. ("Def.'s Reply Br.") [Doc. 129].

On January 24, 2025, TDW filed its motion for summary judgment, as well

as a motion for leave to file its motions and exhibits to motion for summary

judgment and motion to exclude under seal.  Pl.'s Mot. Summary J.; Pl.'s Mot.

Exclude Testimony; Pl.'s Statement of Undisputed Material Facts ("Pl.'s SUMF")

[Doc. 111]; [Pl.'s] Mot. Leave File Mots. Exhs. Mot. Summary J. Mot. Exclude

Under Seal ("Pl.'s Mot. File Under Seal") [Doc. 114].  Wolf Robotics opposed the

motion for summary judgment, and TDW filed a reply brief.  [Def.'s] Mem. Opp'n

[Pl.'s] Mot. Summary J. ("Def.'s Opp'n Br.") [Doc. 122]; Def.'s Statement of

Disputed Material Facts ("Def.'s SDMF") [Doc. 122]; [Pl.'s] Reply Supp. Mot.

Summary J. ("Pl.'s Reply Br.") [Doc. 128].  Wolf Robotics also opposed TDW's

motion to exclude expert testimony and TDW filed a reply brief.  [Def.'s] Mem.

Opp'n [Pl.'s] Mot. Exclude Expert Testimony Michael Davis ("Def.'s Opp'n Pl.'s

Mot. Exclude Testimony") [Doc. 120]; [Pl.'s] Reply Supp. Mot. Exclude Expert

Testimony Mike Davis ("Pl.'s Reply Pl.'s Mot. Exclude Testimony") [Doc. 126].[2]

Wolf Robotics filed a motion to file under seal its motion to exclude testimony on

January 24, 2025.  [Def.'s] Mot. Leave File Mot. Ex. Mot. Exclude Under Seal;

---

[2]  TDW strikes footnote 1 in its opposition brief.  See Notice Correction R.

Def.'s Mot. Limine; Def.'s Sealed Mot. Limine.  TDW opposed Wolf Robotics'

motion to exclude expert testimony.  [Pl.'s] Resp. Def.'s Mot. In Limine Exclude

Testimony Opinions Dr. Craig Forest ("Pl.'s Opp'n Def.'s Mot. Exclude

Testimony") [Doc. 116]; [Pl.'s] Resp. Def.'s Mot. Limine Exclude Testimony

Opinions Dr. Craig Forest ("Pl.'s Sealed Opp'n Def.'s Mot. Limine") [Doc. 117].

Wolf Robotics filed its reply brief.  [Def.'s] Reply Supp. Mot. Limine Exclude

Report Testimony Dr. Craig Forest ("Def.'s Reply Def.'s Mot. Exclude

Testimony") [Doc. 127].

## DISCUSSION

### I.    Motions for Summary Judgment[3]

Wolf Robotics moves to dismiss all of TDW's claims under Ohio state law,

and in the alternative, Oklahoma state law.  See Def.'s Moving Br.

TDW moves for summary judgment as to all of its claims in the Amended

Complaint and Wolf Robotics' counterclaim of breach of contract.  See Pl.'s

Moving Br.

---

[3] The Court grants Plaintiff's Motion to File Under Seal and Defendant's Motion
to File Under Seal.  Reviewing the redacted (or sealed) and unredacted versions of
the Parties' respective documents, TDW's and Wolf Robotics' interests in
protecting the information outweighs the public interest in the disclosure of that
information due to the confidential nature of its business practices and the redacted
information has been narrowly tailored to protect such information.  See JetAway
Aviation, LLC v. Bd. Of Cnty. Comm'rs, 754 F.3d 824, 826 (10th Cir. 2014);
LCvR 5.2-2.

## A.    Legal Standard

Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  See id.  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## B.    Undisputed Facts

The Court finds that the following facts are undisputed:[4]

Wolf Robotics is a wholly-owned subsidiary of Lincoln Electric Holdings, Inc., a global manufacturer of welding products, arc welding equipment, robotic welding equipment, robotic cutting equipment, welding consumables, and plasma and oxy-fuel cutting equipment.  Def.'s SUMF ¶ 1; Pl.'s SDMF ¶ 1.  Wolf Robotics is a recognized leader and innovator of automated arc welding products, metal fabrication, and assembly line solutions.  Def.'s SUMF ¶ 2; Pl.'s SDMF ¶ 2.

---

[4]  The Court refers to "Wolf Robotics" in the instances that "Lincoln Electric" is used by the Parties for consistency throughout this Opinion.

TDW provides industry-leading solutions for pressurized piping systems worldwide, with expertise in welding and manufacturing dating back to the 1950s. See Def.'s SUMF ¶ 3; Pl.'s SDMF ¶ 3.

In late 2016 and early 2017, TDW began soliciting proposals for the design and building of a robotic welder to automate the welding functions for large, "split tee" pipe fittings that TDW manufactures and uses to service pipelines (the "Large Robotic Welder"), as well as assisting in its manufacturing of large fabricated and extruded fittings to be installed on pipelines. See Def.'s SUMF ¶ 4; Pl.'s SDMF ¶ 4. In early 2017, TDW began interviewing companies who possessed the expertise to design, engineer, and manufacture an automated robotic welder for purposes of performing welds on its large fabricated and extruded fittings. Pl.'s SUMF ¶ 1; Def.'s SDMF ¶ 1. During this time, Wolf Robotics traveled to TDW's manufacturing facility for the purpose of observing TDW's processes and evaluating its requirements in welding large fabricated and extruded fittings. Pl.'s SUMF ¶ 2; Def.'s SDMF ¶ 2.

Previously, Wolf Robotics had successfully delivered a robotic welder to TDW for the welding of small, spherical parts (the "Small Robotic Welder"). Def.'s SUMF ¶ 4 n.4; Pl.'s SDMF ¶ 4. On or about February 23, 2017, Chris Norris (from Wolf Robotics) met with Brent Whipple (from TDW) to discuss the proposed Large Robotic Welder. Def.'s SUMF ¶ 5; Pl.'s SDMF ¶ 5; Pl.'s SUMF ¶

4; Def.'s SDMF ¶ 4.  In their discussion about the Large Robotic Welder, of
particular interest to Mr. Norris were the parts that TDW sought to robotically
weld ("Incoming Parts").  Def.'s SUMF ¶ 6; Pl.'s SDMF ¶ 6.[5]  On or about
February 23, 2017, Wolf Robotics toured TDW's facility in Tulsa, Oklahoma for
the purpose of gathering information and details regarding TDW's welding
requirements for its large fabricated and extruded fittings, as well as inspecting
TDW's manufacturing process and the physical parts.  Pl.'s SUMF ¶ 5; Def.'s
SDMF ¶ 5.

## 1.    The Project Proposal

On April 6, 2017, Wolf Robotics submitted revision number four of its
proposal for the Large Robotic Welder (the "Proposal").  Def.'s SUMF ¶ 15; Pl.'s
SDMF ¶ 15; Pl.'s SUMF ¶ 6; Def.'s SDMF ¶ 6; see Def.'s Moving Br. at Ex. 6
(the "Project Proposal").  Prior to Wolf Robotics' submission of the Project
Proposal to TDW, TDW provided Wolf Robotics with drawings of the Incoming
Parts, such as CAD Models and print drawings illustrating the detail of the root
gaps and cross-sectional area variance of TDW's parts to be welded.[6]  Pl.'s SUMF
¶ 7; Def.'s SDMF ¶ 7.

---

[5]  Wolf Robotics explains that "[r]obotic welding requires that the incoming parts
meet certain fit-up requirements (quite literally, the fit between the two parts to be
welded)."  Def.'s SUMF ¶ 7.
[6]  Wolf Robotics disputes that these drawings accurately depicted the Incoming
Parts or how it was prepped to be welded, stating that the prints provided were

The Proposal included a depiction of the Large Robotic Welder, with an exemplar split-tee pipe fitting to be welded; set forth several pieces of key information, including a list of assumptions upon which it was premised; and included a section on assumptions expressly warning TDW that "[a]ny variation from the below assumptions limits the liability of Wolf Robotics." Def.'s SUMF ¶¶ 16–18; Pl.'s SDMF ¶¶ 16–18.

The Proposal also expressly provided, among other assumptions, limitations, and disclaimers, the following statements: "[f]ull penetration welds cannot be guaranteed without manual intervention;" "[w]eld quality is a function of product tolerances.   Variance outside the range of that qualified in any process development activity may cause degradation in weld quality.   In general, gaps are not to exceed one half of the wire diameter;" and "[w]elding and inspection specifications have not been provided.   Additional costs may apply to comply with any welding and inspection specifications." Def.'s SUMF ¶ 19; Pl.'s SDMF ¶ 19. The Proposal was reviewed and approved by TDW. Def.'s SUMF ¶ 20; Pl.'s SDMF ¶ 20.

## 2.    Purchase Agreement and Statement of Work

On or about June 29, 2017, TDW and Wolf Robotics signed the Terms

---

inaccurate, and that "it is indisputable that TDW failed to manufacture the Incoming Parts to the dimensions set forth in its prints." Def.'s SDMF ¶ 7.

and Conditions for the Purchase of Products and Services (the "Purchase Agreement") wherein Wolf Robotics agreed to design, engineer, and build the Large Robotic Welder.  Pl.'s SUMF ¶ 12; Def.'s SDMF ¶ 12; Def.'s Moving Br. at Exh. 8 ("Purchase Agreement").

Section 1 of the Purchase Agreement states:

> Acceptance of these terms binds the parties to these terms and conditions and the conditions, including any supplement thereto, and all specifications and other documents Buyer incorporates by express reference in Buyer's purchase order, or the associated Scope of Work, (collectively, the "Contract").  Any additional or different terms or conditions which may appear in any communications between the parties are hereby expressly objected to, shall not become part of this contract and shall not be effective or binding unless specifically recognized, assented to and agreed to in writing by both parties.

Pl.'s SUMF ¶ 13; Def.'s SDMF ¶ 13.

Section 3 of the Purchase Agreement provides that the terms and conditions contained therein can only be modified by "mutual written agreement of both parties." Id.

Section 5(a) of the Purchase Agreement specifically provides as follows:

> 5.  WARRANTIES;  REMEDIES;  INSPECTION.
> (a)  Goods  and  Services
> Warranty. Seller warrants that Goods (excluding Software, which is warranted as specified in paragraph (d) below) shall be delivered free of defects in material and workmanship and that Services shall be free of defects in workmanship.  Seller further warrants that the goods and services **shall conform to the purchase order and specification requirements**.  The Warranty Remedy Period for Goods (excluding Software, Spare Parts and Refurbished or Repaired Parts) shall end twelve (12) months after installation or eighteen (18) months after date

of shipment, whichever first occurs.  The Warranty Remedy Period for new spare parts shall end twelve (12) months after date of shipment. The Warranty Remedy Period for refurbished or repaired parts shall end ninety (90) days after date of shipment. The Warranty Remedy Period for Services shall end six (6) months after the date of completion of Services.

Pl.'s SUMF ¶ 14; Def.'s SDMF ¶ 14 (emphasis added).

Section 5(b) of the Purchase Agreement provides:

(b) <u>Goods and Services Remedy</u>. If a nonconformity to the foregoing warranty is discovered in the Goods or Services during the applicable Warranty Remedy Period, as specified above, under normal and proper use and provided the Goods has been properly stored, installed, operated and maintained and written notice of such nonconformity is provided to Seller within a reasonable period after such discovery and within the applicable Warranty Remedy Period, Seller shall, at its option, either (i) repair or replace the nonconforming portion of the Goods or re-perform the nonconforming Services or (ii) refund the portion of the price applicable to the nonconforming portion of Goods or Services.  If any portion of the Goods or Services so repaired, replaced or re-performed fails to conform to the foregoing warranty, and written notice of such nonconformity is provided to Seller within a reasonable period after discovery and within the original Warranty Remedy Period applicable to such Goods or Services or 90 days from completion of such repair, replacement or re-performance, whichever is later, Seller will repair or replace such nonconforming Goods or re-perform the Services.  The original Warranty Remedy Period shall not otherwise be extended.

<u>Id.</u>

On September 19, 2017, the Parties executed a Statement of Work ("SOW"), a document that set forth the project's purpose, scope of work, requirements, specifications, applicable standards, and criteria for acceptance.  Def.'s SUMF ¶ 21; Pl.'s SDMF ¶ 21; Pl.'s SUMF ¶ 15; Def.'s SDMF ¶ 15.  The SOW specified

welding the inner and outer diameter saddle weld and flange weld zones for large

fittings in nineteen different sizes, including sizes from 20 inch up to 56 inch

fabricated fittings, 20 inch up to 56 inch extruded fittings, and 20 inch up to 48

inch 3-WAY Tees. Pl.'s SUMF ¶ 16; Def.'s SDMF ¶ 16. The SOW set June 18,

2018 as the date for final acceptance of the Large Robotic Welder. Def.'s SUMF

¶ 23; Pl.'s SDMF ¶ 23. The SOW also included several assumptions and

exclusions, including: (1) "Ability to weld is not defined as ability to 100%

robotically weld all joints;" and (2) "[v]ariable cross-sectional area may dictate that

some joints are not 100% filled robotically and may require finish passes to be

completed manually. [TDW] will work with Wolf Robotics [a/k/a Lincoln

Electric] to optimize the joint geometry . . . ." Def.'s SUMF ¶ 22; Pl.'s SDMF

¶ 22.

     Wolf Robotics sent TDW a letter dated September 19, 2017, acknowledging

and confirming the Purchase Agreement and SOW. Pl.'s SUMF ¶¶ 17–18; Def.'s

SDMF ¶¶ 17–18. Pursuant to the Purchase Agreement and SOW, TDW made

multiple payments to Wolf Robotics totaling an amount of $836, 624.16. Pl.'s

SUMF ¶ 19; Def.'s SDMF ¶ 19. Wolf Robotics accepted each payment from

TDW. Pl.'s SUMF ¶ 20; Def.'s SDMF ¶ 20.

### 3.      The Change Order

On May 8, 2019, TDW personnel traveled to Wolf Robotics' facility in Fort Collins, Colorado for the purpose of meeting with Wolf Robotics to discuss the Robotic Welder Project.  Pl.'s SUMF ¶ 25; Def.'s SDMF ¶ 25.  Following this meeting, Wolf Robotics sent TDW a proposed purchase change order to amend the scope of work for the Robotic Welder Project.  Pl.'s SUMF ¶ 26; Def.'s SDMF ¶ 26.

On August 13, 2019, the Parties executed the "order change request" (the "Change Order").  Def.'s SUMF ¶ 31; Pl.'s SDMF ¶ 31; Pl.'s SUMF ¶ 27; Def.'s SDMF ¶ 27; see Def.'s Moving Br. at Ex. 15 (the "Change Order").  At the time that the Change Order was executed, TDW had already made payments to Wolf Robotics for over 80% of the agreed-upon contract price.  Pl.'s SUMF ¶ 29; Def.'s SDMF ¶ 29.

### 4.      Termination of Project

On November 11, 2019, TDW requested pricing from Wolf Robotics for another possible scope change to the Large Robotic Welder (the "Second Scope Change").   Def.'s SUMF ¶ 38; Pl.'s SDMF ¶ 38; see Def.'s Moving Br. at Exh. 19 (the "Second Scope Change").  On November 15, 2019, Wolf Robotics provided TDW with several options (including pricing and a timeline for each) for the Second Scope Change.  Def.'s SUMF ¶ 39; Pl.'s SDMF ¶ 39.  Wolf Robotics

ceased any further work on the project in light of the potential for yet another scope change.  Def.'s SUMF ¶ 40; Pl.'s SDMF ¶ 40.

On or about May 15, 2020, TDW terminated the Project with Wolf Robotics. Pl.'s SUMF ¶ 32; Def.'s SDMF ¶ 32; Def.'s SUMF ¶ 41; Pl.'s SDMF ¶ 41.  Wolf Robotics received payments totaling $836,624.16 from TDW.  Pl.'s SUMF ¶ 33; Def.'s SDMF ¶ 33.  On or about November 24, 2021, Wolf Robotics sold the Large Robotic Welder to a third party, BWXT, for the sum of $593,196.00.  Pl.'s SUMF ¶ 35; Def.'s SDMF ¶ 35.

### C.     TDW's Breach of Contract Claim (Count I)

Wolf Robotics moves for summary judgment on Count I, arguing that: (1) TDW's claims are time-barred under Ohio law; and (2) in the alternative, if TDW's claims are not time-barred, that TDW fails to prove the elements of breach of contract under Ohio law.  See Def.'s Moving Br.  Wolf Robotics contends that Ohio law applies to this action because it asserts that the Change Order modified the Purchase Agreement and SOW.  Id. at 12–16.

TDW cross-moves for summary judgment on Count I and Counterclaim I, contending that Ohio law does not apply because the Change Order could not have reasonably modified the Purchase Agreement and SOW, and Wolf Robotics breached the terms of the Purchase Agreement and Statement of Work.  Pl.'s Moving Br. at 14–27.

Count I alleges that Wolf Robotics entered into the Purchase Agreement and SOW with TDW; Wolf Robotics breached the Purchase Agreement by failing to design and build the Large Robotic Welder in compliance with the terms of the Purchase Agreement and SOW; Wolf Robotics subsequently entered into the Change Order[7] with TDW; and Wolf Robotics breached the Change Order, causing TDW to incur significant monetary damages. See Am. Compl. ¶¶ 22–26. TDW seeks monetary damages in the amount of $808,332.63, together with pre-and post-judgment interest, until paid, the costs of this action, reasonable attorneys' fees, and such further relief as to which it may be entitled. Id. ¶ 26.

Wolf Robotics contends that Count I should be dismissed because: (1) the lawsuit is timed-barred under Ohio law, as the incorporation of Wolf Robotics' terms and conditions ("Wolf Robotics' Terms & Conditions") to the Change Order arguably modified the forum selection clause in the Purchase Agreement, providing a one-year limitation of liability period for claims brought against Wolf Robotics; and (2) in the alternative, all claims should be dismissed under Ohio law. Def.'s Moving Br. at 15–16; id. at Exh. 15 ("Wolf Robotics' Terms & Conditions").

---

[7]  The Amended Complaint uses the term "2019 Amended Scope." The Court uses the term "Change Order" for consistency throughout this Opinion.

### 1.   Modification of Purchase Agreement

TDW disagrees that the Change Order modified the forum selection clause in the Purchase Agreement because: (1) Wolf Robotics' Terms & Conditions were not properly incorporated into the Change Order to modify the terms and conditions of the Purchase Agreement; and (2) Section 3 of the Purchase Agreement expressly states that "mutual written agreement of both parties" is required for modification of its terms and conditions.  See Pl.'s Opp'n Br. at 16–17.

It is undisputed that the Parties entered into the Purchase Agreement, the SOW, and the Change Order.  Pl.'s SUMF ¶¶ 17–18, 27; Def.'s SDMF ¶¶ 17–18, 27; Def.'s SUMF ¶ 31; Pl.'s SDMF ¶ 31.  The Change Order was entered into after the Purchase Agreement and the SOW.  Id.  The Purchase Agreement includes a forum selection clause for Oklahoma law, while the Change Order includes a forum selection clause for Ohio law.  See Purchase Agreement; Change Order. "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."  15 O.S.2021 § 237.  "It is axiomatic that parties to an existing valid contract may, by mutual consent and consideration, modify the contract."  Johnson v. Brown, Brown, Wood, & Schoelen, Inc., 2024 OK CIV APP 18, ¶ 45, 554 P.3d 781, 790 (quoting Nat'l Interstate Life Ins. Co. v. Thomas, 1981 OK 71, ¶ 30, 630 P.2d 779).  The statute of frauds requires that

modifications to the contract must be memorialized in writing for a sale of goods worth more than $500.  Trillium Transp. Fuels, LLC v. Integral Energy, LLC, No. CIV-20-1197-PRW, 2023 WL 5198513, at *3 (W.D. Okla. Aug. 11, 2023).

The Purchase Agreement provides the relevant sections regarding modification of the contract and the applicable jurisdiction.  Section 1 of the Purchase Agreement provides:

> Acceptance of these terms binds the parties to these terms and conditions and the conditions, including any supplement thereto, and all specifications and other documents Buyer incorporates by express reference in Buyer's purchase order, or the associated Scope of Work, (collectively, the "Contract").  *Any additional or different terms or conditions which may appear in any communications between the parties are hereby expressly objected to, shall not become part of this contract and shall not be effective or binding unless specifically recognized, assented to and agreed to in writing by both parties.*

See Purchase Agreement at 1 (emphasis added).

Section 3 of the Purchase Agreement discusses modification, waiver, and assignment.

> This contract may only be modified by mutual written agreement of both parties.  Any failure of either party to exercise its rights or remedies with respect to any installment or past performance shall not be deemed a waiver of remedies as to subsequent performance or installments. . . .

> Notwithstanding anything to the contrary in this section, the parties at any time shall have the right to propose changes in this contract, including without limitation, changes to drawings, designs, or specifications; quantity, method of shipment or packing; delivery schedule or place of delivery, and work schedule, upon mutual written

> agreement and execution of a change order to reflect adjustments in price and schedule effectuated by such change. . . .
>
> Seller will not perform any work on a change order until the parties have agreed to it in writing.

Id.

Section 14(i) of the Purchase Agreement provides Oklahoma law as the applicable jurisdiction in this case.

> If buyer is TDW Services, Inc. or T.D. Williamson, Inc.: This contract shall be governed by, and construed in accordance with, the laws of the State of Oklahoma and the laws of the United States of America applicable therein and shall be subject to the applicable jurisdiction of the state or federal courts in Oklahoma.

Id. at 5.

Wolf Robotics' Terms & Conditions included a forum selection clause, which provided Ohio as the applicable jurisdiction, and a one-year limited liability provision. Section 27 of the Wolf Robotics' Terms & Conditions states, in relevant part:

> Disputes and Governing Law. In the event of any controversy, claim or dispute arising out of or relating to this Agreement (a "Dispute"), Seller and Buyer shall seek to resolve the matter amicably through diligent, good faith, mutual discussions to be initiated as promptly as possible after a Dispute arises. . . . *This Agreement and any transactions arising therefrom shall be governed and construed under the laws of the State of Ohio*, as applied to contracts entered into and performed in that State, specifically excluding any conflict or choice of law provisions.

See Wolf Robotics' Terms & Conditions at 4 (emphasis added).

Section 12(b) of Wolf Robotics' Terms & Conditions provides a limitation

of liability provision:

> ALL CAUSES OF ACTION AGAINST SELLER ARISING OUT OF
> OR RELATING TO THIS AGREEMENT OR THE PERFORMANCE
> OR BREACH HEREOF SHALL EXPIRE UNLESS BROUGHT
> WITHIN ONE YEAR OF THE TIME OF ACCRUAL THEREOF.

Id.

For the forum selection clause in Wolf Robotics' Terms & Conditions to

apply to this matter, Wolf Robotics' Terms & Conditions must have first been

properly incorporated into the Change Order. Generally, when a contract expressly

refers to and incorporates another instrument in specific terms that show a clear

intent to incorporate that instrument into the contract, both instruments are to be

construed together. See 11 Williston on Contracts § 30:25 (4th ed. 1999). Under

Oklahoma law, "parties may incorporate by reference separate writings, or portions

thereof, together into one agreement" when three requirements are met: "(1) the

underlying contract makes clear reference to the extrinsic document, (2) the

identity and location of the extrinsic document may be ascertained beyond doubt,

and (3) the parties to the agreement had knowledge of and assented to its

incorporation." Walker v. Builddirect.Com Techs. Inc., 2015 OK 30, ¶ 16, 349

P.3d 549, 554. Whether and to what extent extrinsic material has been

incorporated into an agreement presents a question of law for resolution by the

Court. CMI Roadbuilding, Inc. v. SpecSys, Inc., 550 F. Supp. 3d 1180, 1185 (W.D. Okla. 2021).

An exception to the rule of incorporation is when the contract is one of adhesion. An adhesion contract is a standardized contract prepared entirely by one party to the transaction for the acceptance of the other. These contracts, because of the disparity in bargaining power . . . , must be accepted or rejected on a "take it or leave it" basis without opportunity for bargaining." Max True Plastering Co. v. U.S. Fid. & Guar. Co., 1996 OK 28, ¶ 7, 912 P.2d 861, 864. Contracts are unconscionable when "the circumstances existing at the time of making of the contract, and in light of the general commercial background and commercial need of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties."). Barnes v. Helfenbein, 1976 OK 33, ¶ 23, 548 P.2d 1014, 1020. Here, the Change Order is not a contract of adhesion. There is no evidence of coercive pressure to sign or unequal bargaining power, so the exception does not apply.

The Change Order, in addition to amending the scope of the work to be performed by Wolf Robotics, included a website link to Wolf Robotics' Terms & Conditions. [8] The Court observes that the Change Order expressly provided that

---

[8] Courts generally approach the validity of electronic agreements using basic contract law principles, but Wolf Robotics' Terms & Conditions are not considered to be an electronic agreement. It is not a clickwrap agreement (where a computer

the agreement "is governed by the terms and conditions of Wolf Robotics, LLC, which can be viewed at http://www.wolfrobotics.com/terms-conditions/." See Change Order.  Clicking on the website link leads to a webpage document with the heading "Automation Terms and Conditions of Sale (US)" and lists the terms and conditions for sale.  This website link is located above the signature line, clearly referenced, and was not hidden in the contract.  The Change Order made clear reference to the extrinsic document.

However, it is clear to the Court that Plaintiff did not intend to incorporate the terms of the Change Order into the Purchase Agreement, and more specifically, Plaintiff did not agree to change the forum to Ohio when it signed the Change Order.  Online terms and conditions cannot be incorporated into a written agreement when there is no clear intent to include these terms and conditions.  See, e.g., Manasher v. NECC Telecom, No. 06-10749, 2007 WL 2713845, at *5–6 (E.D. Mich. Sept. 18, 2007), aff'd in part, 310 F. App'x 804 (6th Cir. 2009).  TDW provides evidence in the form of affidavits that demonstrate the lack of mutual assent to incorporate Wolf Robotics' Terms & Conditions.  These affidavits

---

user must click a dialogue box, such as an "I agree" button, to signify their assent to terms or conditions on a separate screen or internet page before they can proceed on a transaction)  or a sign-in wrap agreement (where a computer user's assent can be inferred from the fact that they were notified that proceeding with a transaction would signify their agreement to terms or conditions stated on a separate computer screen or internet page, usually accessible through a hyperlink). Smith v. Whaleco Inc., 741 F. Supp. 3d 1104, 1107 (W.D. Okla. 2024).

indicate that TDW did not intend to amend, modify, or otherwise change the terms

and conditions of its Purchase Agreement and Wolf Robotics did not discuss the

altering or modification of the general terms and conditions of the Purchase

Agreement during the conversations, meetings, and negotiations in connection with

the Change Order.  <u>See</u> Pl.'s Reply Br.; Aff. Brent Whipple [Doc. 128-1]; Aff. Jeff

Wilson [Doc. 128-3].  For example, the affidavits of Jeff Wilson and Brent

Whipple both state that "TDW did not intend to alter the terms and conditions

previously agreed upon by the Parties under the Purchase Agreement and

Statement of Work."  Aff. Brent Whipple at ¶ 13; Aff. Jeff Wilson at ¶ 14.

Wolf Robotics argues that the affidavits of Brent Whipple and Jeff Wilson

are "sham affidavits" that should be excluded.  Def.'s Reply Br. at 4–6.

A district court must first "determine whether the conflicting affidavit is

simply an attempt to create a 'sham fact issue'" before excluding it from summary

judgment consideration.  <u>Durtsche v. Am. Colloid Co.</u>, 958 F.2d 1007, 1010 n.2

(10th Cir. 1992).  "[A]n affidavit may not be disregarded [solely] because it

conflicts with the affiant's prior sworn statements.  In assessing a conflict under

these circumstances, however, courts will disregard a contrary affidavit when they

conclude that it constitutes an attempt to create a sham fact issue."  <u>Franks v.</u>

<u>Nimmo</u>, 796 F.2d 1230, 1237 (10th Cir. 1986) (internal citation omitted).  The

U.S. Court of Appeals for the Tenth Circuit has described cases in which an

affidavit raises but a sham issue as "unusual." Id.  In determining whether an

affidavit creates a sham fact issue, the Court considers whether: "(1) the affiant

was cross-examined during his earlier testimony; (2) the affiant had access to the

pertinent evidence at the time of his earlier testimony or whether the affidavit was

based on newly discovered evidence; and (3) the earlier testimony reflects

confusion which the affidavit attempts to explain." Ralston v. Smith & Nephew

Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001) (quotation omitted).

     Wolf Robotics contends that "[d]espite its corporate representative's

admission on cross-examination that Brent Whipple had authority to sign the

Change Order, TDW proffers two sham affidavits directly contradicting that

binding, sworn testimony: 'Q. . . . Brent approved this change order?  A. I do see

that, yes. * * * Q. So he had the authority? A. Yes.'"  Def.'s Reply Br. at 1 (citing

Deposition of Jeff Wilson as Corporate Representative for TDW ("Deposition of

Jeff Wilson" or "Wilson Dep.") [Doc. 129-1]).  There is no question that Jeff

Wilson was cross-examined during his deposition and had access to the pertinent

evidence at the time of this deposition (the agreement).  The Deposition of Jeff

Wilson does not reveal material contradictions in the affidavits of Brent Whipple

and Jeff Wilson concerning Brent Whipple's limited authority to amend or modify

the terms and conditions of the Change Order.  In the Deposition of Jeff Wilson,

Jeff Wilson was asked if Brent Whipple approved of the Change Order, and Jeff

Wilson answered in the affirmative.  Wilson Dep. at 109:5–7.  Jeff Wilson was

then asked if Brent Whipple had the authority to do so on behalf of TDW, and Jeff

Wilson answered in the affirmative.  Id. at 109:8–18.

The relevant statements in the Affidavit of Jeff Wilson regarding Brent

Whipple's authority to approve the Change Order are as follows:

- Brent Whipple was given the narrow and limited authority to enter into the [Change Order] on behalf of TDW with Wolf Robotics.

- Brent Whipple only had the authority to enter into the [Change Order] to reduce the scope of work to be done under the Parties' original Agreement pursuant to the terms contained in the Purchase Agreement of Statement of Work.

- Brent Whipple did not have the authority to amend, modify or otherwise change the terms and conditions of the Parties' original Agreement.

Aff. Jeff Wilson at ¶¶ 11–13.

The relevant statements in the Affidavit of Brent Whipple regarding his

authority to approve the Change Order are as follows:

- While I was at TDW, I was given the narrow and limited authority to enter into the Change Order on behalf of TDW[,] which was requested and necessitated by Wolf Robotics.

- I only had the authority to enter the [Change Order] to reduce the scope of work, or the number of parts and/or fittings which were to be welded by the Robotic Welder, under the Parties' original Agreement pursuant to the terms contained in the Purchase Agreement and Statement of Work.

- I did not have the authority to amend, modify or otherwise change the terms and conditions of the Parties' Agreement.

Aff. Brent Whipple at ¶¶ 9–11.

Because Jeff Wilson was cross-examined and there are no material contradictions, these affidavits do not fall within the ambit of creating a sham fact issue and may be relied upon.

Based on the evidence before the Court, there was no clear intent to incorporate Wolf Robotics' Terms & Conditions. Wolf Robotics did not discuss altering or modifying the general terms and conditions of the Purchase Agreement during the conversations, meetings, and negotiations in connection with the Change Order. This demonstrates that TDW did not intend to amend, modify, or otherwise change the terms and conditions of its Purchase Agreement based on Wolf Robotics' Terms & Conditions. Therefore, the Court concludes as a matter of law that Wolf Robotics' Terms & Conditions with the Ohio choice of law provision did not modify the Oklahoma choice of law provision in the Purchase Agreement, and the forum selection clause and limited liability provision in Wolf Robotics' Terms & Conditions is unenforceable. Due to the lack of mutual consent, the terms and conditions of the Purchase Agreement have not been modified by Wolf Robotics' Terms & Conditions. The Court holds that this matter is neither governed by Ohio law nor barred by a one-year limited liability provision. Oklahoma law will apply.

## 2.    Validity of the Change Order

TDW also contends that the Change Order was not a valid or enforceable

contract because it lacked new consideration.  TDW asserts that it did not receive

anything of value in exchange for its agreement to enter into the Change Order,

which reduced Wolf Robotics' obligations under the terms of the Parties' original

contract contained in the Purchase Agreement and SOW, and was never intended

to be a wholesale change of the Contract and Project, rather it was sought to

mitigate TDW's damages from Wolf Robotics' failure to meet its terms and

conditions agreed upon in the original contract.  Pl.'s Moving Br. at 14–16; Pl.'s

Opp'n Br. at 18.

Wolf Robotics argues that consideration was given for the Change Order,

such as additional equipment and attendant design hours that were not included in

the SOW, Proposal, or Purchase Agreement.  Def.'s Opp'n Br. at 10–17; Def.'s

Reply Br. at 8.

The formation of a contract requires: (1) parties capable of consenting; (2)

their consent (*i.e.*, meeting of minds); (3) a lawful object; and (4) sufficient cause

or consideration. 15 O.S.2011 § 2.[9]  An essential element of a contract is sufficient

---

[9]  The Court finds that there is no question of actual or apparent authority by Brent
Whipple to enter the Change Order because he had signed it on behalf of TDW and
Jake Hansen on behalf of Wolf Robotics.  See Change Order; see also Def.'s
SUMF ¶ 31; Pl.'s SDMF ¶ 31; Pl.'s SUMF ¶ 27.

consideration.  Id.  Generally, consideration exists as long as there is a benefit to the promisor or a detriment to the promisee.  Thompson v. Bar-S Foods Co., 2007 OK 75, ¶ 19, 174 P.3d 567, 574.  It is undisputed that Wolf Robotics sent TDW a proposed purchase change order that would amend the scope of the Robotic Welder Project.  Pl.'s SUMF ¶ 26; Def.'s SDMF ¶ 26.  The Parties executed the Change Order on August 13, 2019.  Def.'s SUMF ¶ 31; Pl.'s SDMF ¶ 31; Pl.'s SUMF ¶ 27; Def.'s SDMF ¶ 27.  At the time that the Change Order was executed, TDW had already made payments to Wolf Robotics for over 80% of the agreed-upon contract price.  Pl.'s SUMF ¶ 29; Def.'s SDMF ¶ 29.

The Court concludes that there was sufficient consideration for the Change Order to be a valid agreement.  TDW, as the promisor, received the benefit of a change in scope work to be finished by Wolf Robotics, and Wolf Robotics, as the promisee, had the detriment of accommodating the change of scope as outlined in the Change Order.  It is undisputed that Wolf Robotics and TDW agreed to a purchase change order that amended the scope of the Robotic Welder Project, whether by adding or reducing work for certain aspects of the project.  See Pl.'s SUMF ¶¶ 26–27; Def.'s SDMF ¶¶ 26–27.  The Parties executed the Change Order on August 13, 2019.  Def.'s SUMF ¶ 31; Pl.'s SDMF ¶ 31.

The Change Order solely modified the scope of work, and did not modify the terms and conditions in the Purchase Agreement because Wolf Robotics'

Terms & Conditions were not properly incorporated due to the lack of mutual consent. The Court views the Contract at issue to be collectively the Purchase Agreement, the SOW, and the Change Order (to the extent that it modified the SOW).

### 3.    Failure to Perform

To establish a breach of contract, a plaintiff must show: (1) the formation of a contract; (2) breach of the contract; and (3) damages as a result of the breach. Cates v. Integris Health, Inc., 2018 OK 9, ¶ 4, 412 P.3d 98, 103. "A breach of contract is a material failure of performance of a duty arising under or imposed by agreement." Bennett v. Allstate Life Ins. Co., 623 F. Supp. 3d 1236, 1248 (W.D. Okla. 2022) (quoting Lewis v. Farmers Ins. Co., 1983 OK 100, ¶ 5, 681 P.2d 67, 69).

"Every contract in Oklahoma contains an implied duty of good faith and fair dealing." Wathor v. Mut. Assur. Adm'rs, Inc., 2004 OK 2, ¶ 5, 87 P.3d 559, 561. Under this duty, neither party may "act to injure the parties' reasonable expectations nor impair the rights or interests of the other to receive the benefits flowing from their contractual relationship." First Nat'l Bank & Tr. Co. of Vinita v. Kissee, 859 P.2d 502, 509 (Okla. 1993) (per curiam); see also Devery Implement Co. v. J.I. Case Co., 944 F.2d 724, 728 (10th Cir. 1991) ("The covenant requires that no party destroy or injure another party's right to receive the fruits of

the contract." (internal quotation marks omitted)).  Under Oklahoma law, "'a party

to a contract may not by his deliberate act prevent the happening of a condition

therein and then take advantage of the condition to defeat liability upon the

contract.'"  Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319,

1323 (10th Cir. 1987) (citation and brackets omitted).  In other words, if a

contractual benefit for party A depends on the occurrence of a condition under the

control of party B, party B may be in breach of contract if it acts in bad faith to

prevent the occurrence of the condition.  Grubb v. DXP Enters., Inc., 85 F.4th 959,

966–67 (10th Cir. 2023).

TDW contends that Wolf Robotics breached the Contract by failing to

design, engineer, and build the Large Robotic Welder according to the

requirements and specifications of TDW.  See Pl.'s Moving Br. at 23.  TDW states

that "the print drawings provided to Wolf Robotics prior to entering the Purchase

Agreement illustrated the detail of the root gap and cross-sectional area variance of

the fabricated fittings," which were critical to understanding the design,

engineering, and building of the Large Robotic Welder, so that Wolf Robotics had

all the information deemed necessary to evaluate the Project prior to submitting the

Project Proposal to TDW.  Id. at 23–24.

Wolf Robotics contends that TDW prevented Wolf Robotics from

performing its contractual obligations by: (1) failing to provide Incoming Parts

within the tolerances set forth by Wolf Robotics, and (2) terminating the Robotic Welder Project when Wolf Robotics was on track to perform its obligations set forth in the Change Order.  <u>See</u> Def.'s Moving Br. at 20.  Wolf Robotics states that TDW failed to manufacture the Incoming Parts to its prints or to the tolerances that Brent Whipple represented they would meet after TDW "revamped" the cutting process for Incoming Parts.  Def.'s SDMF ¶ 24.

Wolf Robotics met with TDW to discuss that it could not build the Large Robotic Welder to perform the welds as set forth in the Purchase Agreement and SOW.  Pl.'s SUMF ¶ 22; Def.'s SDMF ¶ 22.[10]  The Change Order was executed and modified the SOW, as discussed above.  Wolf Robotics then attempted to modify the initial SOW and Change Order again, with a second proposed change order to amend the scope of work to be performed by Wolf Robotics to meet its contractual obligation to design, engineer, and build the Large Robotic Welder.  Def.'s SUMF ¶ 38; Pl.'s SDMF ¶ 38.  TDW did not agree to enter into a second proposed change order with Wolf Robotics.  Pl.'s SUMF ¶ 32; Def.'s SDMF ¶ 32; Def.'s SUMF ¶ 42; Pl.'s SDMF ¶ 42.

---

[10]  Wolf Robotics states that TDW did not have the Incoming Parts, as cut by the Cloos robot, available for Wolf Robotics to inspect until March 2019, and upon inspection, informed TDW that the Incoming Parts were not within the tolerances that TDW had represented they would be produced.  Def.'s SDMF ¶ 22.

The Court holds that it is undisputed that Wolf Robotics did not complete production of the Large Robotic Welder and failed to perform its contractual obligations, ultimately breaching the contract terms. Wolf Robotics breached the Contract by failing to design, engineer, or manufacture a Large Robotic Welder that satisfied the contractual requirements and specifications established by the Parties.

Therefore, the Court grants summary judgment in favor of TDW on its breach of contract claim (Count I).

### D.    Wolf Robotics' Counterclaim (Counterclaim I)

Wolf Robotics' Counterclaim alleges that "TDW breached the [Purchase Agreement], SOW, and Change [Order]"; "TDW's breaches of the [Purchase Agreement, SOW and Change Order] include, but are not limited to, the following: (a) its May 20, 2020 repudiation of those agreements; (b) its failure to make the final payments required by these agreements, totaling $380,446.04; and (c) its failure to accept delivery of the [Large] Robotic Welder;" and "TDW's breaches are a direct and proximate cause of [Wolf Robotics'] damages, which include but are not limited to: (1) the remainder of the purchase price for the [Large] Robotic Welder; (2) fair rent for the valuable floor space taken by the Robotic Welder from November 15, 2019 to November 2021; (3) all expenses related to the work that went into updating the [Large] Robotic Welder in accordance with the modified

contract; (4) compensation for the significant time and resources expended by

[Wolf Robotics'] to gain clarity about the finalization and delivery of the [Large]

Robotic Welder, as well as expenses incurred in marketing of the Robotic Welder

to third parties; and (5) all other incidental and overhead costs available." Def.'s

Counterclaim ¶¶ 27–29.

As discussed above, Wolf Robotics did not complete production of the

Large Robotic Welder, and in turn, breached the Contract by failing to design,

engineer, or manufacture a Large Robotic Welder that satisfied the contractual

requirements and specifications established by the Parties. Because Wolf Robotics

breached the Contract, TDW did not need to agree to a second proposed change

order. TDW did not breach its contractual obligations by terminating the project,

not paying the rest of the remaining balance, or refusing the delivery of a product

that did not meet its specifications according to the relevant contract terms.

Accordingly, Wolf Robotics' counterclaim for breach of contract

(Counterclaim I) is dismissed.

## E.    Constructive Fraud/Deceit (Count II)

The Amended Complaint alleges that "[o]n or about February 23, 2017,

Wolf Robotics made a sales presentation to TDW regarding its ability to design

and build a robotic welder that would perform the specific welding functions

requested and required by TDW. The representations made by Wolf Robotics at

the sales presentation were made by its project manager, marketing person, and engineers." Am. Compl. ¶ 30. The Amended Complaint further alleges that: (1) "[Wolf Robotics] misrepresented its technology and ability to design and build the Robotic Welder, and failed to disclose critical problems and issues with the design and building of the Robotic Welder, until it had nearly been completed, and TDW had paid nearly all of the contract price to [Wolf Robotics]"; (2) "[Wolf Robotics] intentionally concealed material facts and information from TDW for the purpose of obtaining payments from TDW"; (3) TDW continued to make payments to Wolf Robotics pursuant to the terms of the Agreement as it was "unaware of the material facts concealed by [Wolf Robotics] and in reliance on [Wolf Robotics'] representations that it could design and build the Robotic Welder as set forth in the Agreement and SOW"; (4) "[Wolf Robotics] misrepresented its technology and ability to design and build the Robotic Welder, and failed to disclose critical problems and issues with the design and building of the Robotic Welder in connection with inducing TDW into the [Change Order]; and (5) "as a result of TDW's reliance on representations from [Wolf Robotics] that induced TDW into entering the [Purchase] Agreement, SOW, and [Change Order], TDW suffered non-contract monetary damages, including but not limited to, lost time and labor damages." Id. ¶¶ 31–35.

The Amended Complaint alleges that "TDW incurred lost time and expenses meeting with [Wolf Robotics] engineers and project managers to discuss the [Change Order]" between March 20, 2019 and May 8, 2019. Id. ¶ 36. TDW seeks monetary damages in an amount in excess of $75,000.00 for compensatory, consequential, incidental, and punitive damages, together with pre-and post-judgment interest, until paid, the costs of this action, reasonable attorneys' fees, and such further relief as to which it may be entitled. Id.

Under Oklahoma law, a fraud claim requires: (1) a false material misrepresentation; (2) made as a positive assertion which is either known to be false or is made recklessly or without knowledge of the truth; (3) with intent that it be acted upon; and (4) which is relied upon by the other party to his own detriment. Bowman v. Presley, 2009 OK 48, ¶ 13, 212 P.3d 1210, 1217–18. Constructive fraud is "the concealment of material facts which one is bound under the circumstances to disclose." Bankers Trust Co v. Brown, 2005 OK CIV APP 1, ¶ 14, 107 P.3d 609, 613 (quoting Varn v. Maloney, 1973 OK 133, ¶ 18, 516 P.3d 1328, 1332). To seek recovery on a theory of constructive fraud, TDW must prove that: (1) Wolf Robotics owed TDW a duty of full disclosure; (2) Wolf Robotics misstated a fact or failed to disclose a fact to TDW; (3) Wolf Robotics' misstatement or omission was material; (4) TDW relied on Wolf Robotics' material misstatement or omission; and (5) TDW suffered damages as a result of

defendant's material misstatement or omission.  Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1180–81 (10th Cir. 2008).  There is no requirement that the plaintiff must prove that the defendant acted with the intent to deceive.  See State ex rel. Okla. Bar Ass'n v. Lloyd, 1990 OK 14, ¶ 16 n.16, 787 P.2d 855, 860 n.16.

A party cannot allege simultaneous breach of contract and fraud claims unless the two are "sufficiently distinct."  To be sufficiently distinct, a fraud claim must be based on different facts and must have resulted in different actual damages.  Key v. Exxon Mobil Corp., 508 F. Supp. 3d 1072, 1086 (E.D. Okla. 2020); McGregor v. Nat'l Steak Processes, Inc., No. 11-CV-0570-CVE-TLW, 2012 WL 314059, at *3 (N.D. Okla. Feb. 1, 2012).  TDW can satisfy the different damages requirement if its allegations "could potentially support an award of extra-contractual damages."  Edwards v. Farmers Ins. Co., No. 08-CV-730-TCK-PJC, 2009 WL 4506218, at *5 (N.D. Okla. Nov. 24, 2009).

The Court considers whether the facts supporting each claim and the damages arising as a result of each claim are different.  Brown v. Elephant Talk Commc'ns Corp., No. CIV-18-00902-PRW, 2020 WL 7220793, at *8 (W.D. Okla. Dec. 7, 2020).  Simultaneous pursuit of fraud and breach of contract claims can be appropriate when "the formation of the contract is premised upon an intentionally deceptive promise to act; i.e., fraud in the inducement of a contract."  Atkinson,

Haskins, Nellis, Brittingham, Gladd & Fiasco, P.C. v. Oceanus Ins. Grp., 2014 WL

3891267, at *4–5 (N.D. Okla. Aug. 7, 2014) (citing F.D.I.C. v. Hamilton, 122 F.3d

854, 863 (10th Cir. 1997)).

> Fraud can be predicated upon a promise to do a thing in the future when the promisor's intent is otherwise. The basis of fraudulent misrepresentation is the creation of a false impression and damage sustained as a natural and probable consequence of the act charged. The fraudulent representation need not be the sole inducement which causes a party to take the action from which the injury ensued. The key is that without the representation the party would not have acted. The liability for misrepresentation depends upon whether the person relying thereon was in fact deceived.

F.D.I.C., 122 F.3d at 858 (quoting Tice v. Tice, 672 P.2d 1168, 1171 (Okla.

1983)).

The Court holds that the facts alleged in TDW's breach of contract claim in

Count I are not sufficiently distinct from the facts alleged in support of TDW's

claim of constructive fraud and deceit in Count II.  While Count I alleges breaches

of the Contract, and Count II concerns fraud in the inducement or Wolf Robotics'

misrepresentations to TDW regarding the Contract, both Counts I and II rely on the

same set of facts regarding TDW's decision to enter into the agreements with Wolf

Robotics to produce the Large Robotic Welder.  Even though Count II purports to

seek different damages than Count I, these two Counts are based on the same set of

facts.  Therefore, TDW's claim for constructive fraud/deceit (Count II) is

dismissed.

### F.    Violation of the Oklahoma Consumer Protection Act (Count III)

The Amended Complaint alleges that: (1) "[Wolf Robotics] made representations regarding [the Large] Robotic Welder's conformance with TDW's specifications and standards, and [Wolf Robotics] made representations regarding its ability to design and build the [Large] Robotic Welder as set forth in the [Purchase] Agreement and SOW"; (2) "[t]he representations made by [Wolf Robotics] were false or misleading and [Wolf Robotics] knew or had reason to know that its representations were false or misleading in violation of 15 O.S. § 753; (3) [Wolf Robotics'] actions constitute deceptive trade practices as defined by 15 O.S. § 752 of the Oklahoma Consumer Protection Act"; and (4) "[a]s a result of [Wolf Robotics'] deceptive trade practices and violations of the Oklahoma Consumer Protection Act, TDW has incurred significant non-contract monetary damages resulting from significant lost time and expenses related to the pre-contract activities as well as time and expense incurred related directly to [Wolf Robotics'] inducement of TDW to enter into the [Change Order]."  Am. Compl. ¶¶ 37–40.

The OCPA provides a private right of action to consumers when they can show: "(1) that the defendant engaged in an unlawful practice as defined [by the statute]; (2) that the challenged practice occurred in the course of defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4)

that the challenged practice caused the plaintiff's injury."  Braver v. Clear Sky

Fin., LLC, No. CIV-22-710-R, 2024 WL 3488082, at *3 (W.D. Okla. July 18,

2024) (citing Patterson v. Beall, 2009 OK 92, ¶ 30, 19 P.3d 839, 846).

TDW argues that Wolf Robotics violated the OCPA by committing "an

unfair or deceptive trade practice as defined in Section 752 of this title."  15 O.S.

§ 753(21).  Section 752 defines "deceptive trade practice" as a "misrepresentation,

omission or other practice that has deceived or could reasonably be expected to

deceive or mislead a person to the detriment of that person.  Such a practice may

occur before, during or after a consumer transaction is entered into and may be

written or oral."  15 O.S. § 752(13).  TDW contends that Wolf Robotics engaged in

deceptive trade practices by entering into contractual agreements for robotic

systems that it was not capable of providing because Wolf Robotics failed to: (1)

complete its due diligence at the initial stages of preparing its bid, and undertook

the design and manufacturing of a robotic welder that could not meet the

specifications (as per the conclusion of its expert); and (2) disclose the

impossibility of meeting TDW's expectations from the start of the project.  Pl.'s

Moving Br. at 29–31.

There is no evidence that Wolf Robotics failed to complete its due diligence

in preparing the proposal or to disclose that it could not meet the specifications set

forth by TDW for the Large Robotic Welder.  Prior to the execution of the

Purchase Agreement and SOW, it is undisputed that Wolf Robotics was provided print drawings of the Incoming Parts that illustrated the detail of the root gaps and cross-sectional area variance of the TDW's parts to be welded, which depicted the Incoming Parts and how it was prepped to be welded.  See Pl.'s SUMF ¶ 7; Def.'s SDMF ¶ 7.  There is no evidence demonstrating that Wolf Robotics engaged in "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person" under the Oklahoma Consumer Protection Act.

Accordingly, TDW's claim for violation of the Oklahoma Consumer Protection Act (Count III) is dismissed.

### G.      Unjust Enrichment (Count IV)

The Amended Complaint alleges that Wolf Robotics has unjustly benefited from TDW's payment of $808,332.63, as well as from the sale of the Robotic Welder to a third party and Wolf Robotics' retention of those funds.  Am. Compl. ¶¶ 41–51.  TDW seeks monetary damages in excess of $75,000.00 for compensatory, consequential, incidental, and punitive damages, together with pre- and post-judgment interest, until paid, the costs of this action, reasonable attorneys' fees, and such further relief as to which it may be entitled.  Id. ¶ 51.

Oklahoma recognizes that implied-in-law contracts ("quasi-contracts" or "constructive contracts") are mere legal fictions when the intention of the parties is

disregarded, and an implied-in-law contract is "imposed in order to adapt the case to a given remedy." T & S Inv. Co. v. Coury, 1979 OK 53, ¶ 5, 593 P.2d 503, 504–05. A breach of an implied-in-law contract, otherwise known as a claim for unjust enrichment, arises "from the failure of a party to make restitution in circumstances where it is inequitable," or one party holds property "that, in equity and good conscience, it should not be allowed to retain." Harvell v. Goodyear Tire & Rubber Co., 2006 OK 24, ¶ 18, 164 P.3d 1028, 1035.

The Purchase Agreement, SOW, and Change Order were valid and enforceable agreements and not implied-in-fact contracts. The Contract is not an implied-in-fact contract. Because the Court is granting summary judgment in favor of TDW for its breach of contract claim, and TDW is entitled to damages from the breach of contract claim, the Court dismisses TDW's unjust enrichment claim.

Accordingly, the Court grants TDW's Motion for Summary Judgment as to Counts I and Counterclaim I. The Court denies TDW's Motion for Summary Judgment as to Counts II, III, and IV, and grants Wolf Robotics' Motion for Summary Judgment as to Counts II, III, and IV based on Oklahoma law.

## II.    Motions to Exclude Expert Testimony

Each party moves to exclude expert testimony from the opposing party. TDW moves to exclude the testimony of Wolf Robotics' expert Michael Davis

("Davis") and seeks to have the Court strike and/or preclude Davis from testifying as an expert at the trial of this matter.  Pl.'s Mot. Exclude Testimony.  Wolf Robotics moves to exclude the testimony and opinions of Dr. Craig Forest ("Forest") as inadmissible.  See Def.'s Mot. Exclude Testimony.

Because the Court grants summary judgment in favor of TDW on Count I, and dismisses Counterclaim I and Counts II, III, and IV, the Court denies Defendant's Motion to Exclude Testimony and Plaintiff's Motion to Exclude Testimony as moot.

**CONCLUSION**

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

(1) The Court grants in part and denies in part Plaintiff's Motion for Summary Judgment [Doc. 111] and Defendant's Motion for Summary Judgment [Doc. 105].  Summary judgment is entered in favor of Plaintiff for Plaintiff's claim of breach of contract (Count I).  Defendant's claim of breach of contract (Counterclaim I), and Plaintiff's claims for constructive fraud/deceit (Count II), violation of the Oklahoma Consumer Protection Act (Count III), and unjust enrichment (Count IV) are dismissed.

(2) The Court denies as moot Plaintiff's Motion to Exclude Testimony of Defendant's Expert Michael Davis [Doc. 110] and Defendant's Motion in

Limine to Exclude Testimony and Opinions of Dr. Craig Forest [Docs. 112, 113].

(3)  The Court grants Defendant's Motion for Leave to File Motion and Exhibits to Motion to Exclude Under Seal [Doc. 109] and Plaintiff's Motion for Leave to File Exhibits and Motion for Summary Judgment and Motion to Exclude Under Seal [Doc. 114].

(4) A status conference will be held on June 5, 2025 at 3:00 p.m. CST/4:00 p.m. EST via videoconference to discuss potential settlement/mediation, trial, and any other remaining issues.

(5) The Parties shall submit pretrial disclosures on or before June 17, 2025.

(6) The Parties shall submit a pretrial order on or before June 24, 2025.

(7) A pretrial conference will be held on July 1, 2025 at 1:30 pm CST/2:30 p.m. EST via videoconference.

(8) A jury trial on damages will be held at the Page Belcher Courthouse in Tulsa, Oklahoma starting on July 21, 2025 at 9:00 a.m.

IT IS SO ORDERED this 30th day of May, 2025.

/s/ Jennifer Choe-Groves

Jennifer Choe-Groves

U.S. District Court Judge[*]

---

[*]  Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.